548 So.2d 1265 (1989)
STATE of Louisiana, Appellee,
v.
David E. BOYD, Appellant.
No. 20,626-KA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1989.
Rehearing Denied September 21, 1989.
*1266 Jones & Johnson, Jerry L. Jones, Monroe, for appellant.
John M. Lancaster, Oak Grove, for appellee.
Before MARVIN, FRED W. JONES, Jr., and HIGHTOWER, JJ.
FRED W. JONES, Jr., Judge.
Defendant David Boyd was charged by bill of indictment with two counts of distribution of marijuana, in violation of La.R.S. 40:966. He was found guilty by a jury on both counts. After a brief hearing on a motion for new trial, the defendant waived sentencing delays, and was sentenced to five years at hard labor on each count, to run concurrently. Defendant appealed, reserving three assignments of error. For the following reasons, we affirm the conviction and sentence of the defendant.
Sheriff Bennett of West Carroll Parish hired Cleveland Ray Smith, a commissioned deputy in Concordia Parish, to work undercover in West Carroll Parish. Smith had acquired undercover operation experience in several other Louisiana parishes, and had been doing undercover work for approximately twelve years in Texas and Mississippi as well as Louisiana.
Sheriff Bennett stated at trial he needed someone for drug undercover work who was unknown in the area. Smith was recommended to Bennett, who drove to Concordia and interviewed Smith prior to hiring him. At trial he stated he was pleased with Smith's appearance because he believed Smith would blend in with "the drug traffickers and people who were using drugs or selling drugs." Operation procedures mandated Smith was to transport any drugs he bought to Deputy Philley, as his primary contact, as soon as possible after the transaction. Under no circumstances was Smith to distribute or use any drugs.
*1267 Daily contact with West Carroll's chief criminal officer, Deputy Philley, began as soon as Smith moved into the area. Smith used a hotel room for 2 to 3 days before renting a house where he lived with his wife, and three children: ages 15, 15 months, and a six-week old baby girl. As part of his cover, Smith told people in West Carroll Parish he had been shot during a robbery while working at a store. Smith claimed he received S.S.I. benefits and a check from the company he formerly worked for as a result of his injuries.
Deputy Philley testified he spoke to Agent Smith 3-4 times a day and had personal contact once or twice a day. Regular contact times were established. Meetings were set at different times and places during telephone contacts. Philley did not go to Smith's home; he believed any contact there would blow Smith's cover and render the operation useless.
Smith was paid $300 per week, $150 per month car allowance, and his medical insurance premium for himself and his family. His salary was not dependent on a quota nor did he receive a bonus for arrests. The undercover operation resulted in 26 warrants and 21 arrests (at the time of trial). The average age of the defendants was 26: one was 18, three were 19, one was 66, and the rest were in their 20s or 30s.
Sheriff Bennett testified he was aware Agent Smith had a bad back and had gotten a prescription for "Tylenol 3s" from Dr. Bronson while he was in Oak Grove. Additionally, he testified none of their confidential informants had named Agent Smith as a drug user nor had he received any complaints about him while he was in Oak Grove.
The investigation ended abruptly after several people had suspected Smith of being a drug agent and requested he engage in illegal drug activity in order to prove he was not an agent. Over 20 arrests resulted from Smith's participation in the undercover operation; one of whom was defendant Boyd.
On September 12, 1987, at about 7:00 p.m., defendant entered Smith's house, pulled two bags of marijuana out of his wife's purse, and proceeded to sell it to Smith, Joey Desselle and Scott Waits. One of the bags weighed approximately an ounce and was broken down to make two, ½-oz. bags of marijuana. Defendant was paid $50 for the marijuana.
Boyd was in Smith's house for about five to ten minutes. After the sale, Smith placed the marijuana in a dresser drawer in his bedroom. A short time later, he called Deputy Philley and made arrangements for a meeting to turn over the marijuana and his written report of the incident.
At approximately 10:30 p.m., Smith met with Deputy Philley at a rodeo arena on the edge of town. Smith testified he did not solicit defendant to sell or give drugs to him.
On October 5, 1987, Boyd approached Smith and asked him if he needed an ounce of marijuana. Smith responded he did, and defendant stated he would return to Smith's house in 15 minutes. During a subsequent conversation with defendant, defendant told Smith to meet him at his trailer in 15 minutes. When Smith arrived at Boyd's trailer, defendant was not there. His wife was; she let him in to wait and told Smith her husband would be back in a few minutes.
Defendant returned shortly thereafter with approximately a quarter pound of marijuana rolled up in a green and white dishtowel. He walked over and threw the dishtowel in front of Smith; the dishtowel opened up and several bags of marijuana were revealed. Smith took out a one-oz. bag and paid defendant $100. Smith turned over the marijuana and a written report to Deputy Philley at 10:30 p.m. on the same day.
Boyd's defense was designed to discredit Agent Smith. Several witnesses who were charged as a result of the investigation described Deputy Ray Smith as a user and drug dealer named "Ponytail". Others who claimed Smith was guilty of drug related crimes were either married to defendants, or in one case, the witness was the mother of one defendant and the mother-in-law of another defendant.
*1268 However, the one witness who was not a defendant or had significant relations to a defendant, Scott Waits, supported Agent Smith's version of what occurred on September 12, 1987 when Boyd came to Smith's home and sold him some marijuana.
Assignment of Error No. 1
On appeal, defendant asserted the trial court committed reversible error when it allowed certain defense witnesses to invoke their Fifth Amendment right against self-incrimination in a blanket fashion without tailoring their testimony to exclude self-incriminating testimony. This allegation is a misstatement of the actual events and without merit.
The Fifth Amendment of the United States Constitution reads, in pertinent part: "No person ... shall be compelled in any criminal case to be a witness against himself." The court in State v. Young, 448 So.2d 760 (La.App. 2d Cir.1984), writ denied, 450 So.2d 954 (La.1984), explained the law regarding a witness' right to claim the privilege against self-incrimination, stating:
"The privilege against self-incrimination must be liberally construed in favor of the party asserting it; to sustain the privilege it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim should be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence. State v. Wilson, 394 So.2d 254 (La.1981). See also In Re Parker, 357 So.2d 508 (La.1978).
The general rule is that it is reversible error to allow a witness to claim a blanket privilege. State v. Darby, 403 So.2d 44 (La.1981); State v. Wilson, supra. However, that rule is subject to exceptions. See State v. Edwards, 419 So.2d 881 (La.1982); State v. Coleman, 406 So.2d 563 (La.1981); State v. Darby, supra; State v. Wilson, supra. The defendant has no absolute right to force a witness claiming his privilege against self-incrimination to invoke that right before the jury and have the trier-of-fact draw an inference from the invocation of the privilege. State v. Edwards, supra."
Those witnesses who were granted rights against self-incrimination were listed by defendant as: Shannon Smith, Mitchell Dye, Shirl Fabala, John Riddell, and Kerry Stewart. In his brief, defendant added Teris Ashburn.
Any contention the trial court incorrectly permitted Kerry Stewart and John Riddell to assert their Fifth Amendment right against self-incrimination in blanket fashion was erroneous. Both Stewart and Riddell testified at trial and did not assert their right against self-incrimination. Thus, the substantial rights of the accused have not been affected with regard to Stewart and Riddell. La.C.Cr.P. Art. 921.
Pursuant to La. Const., Art. 1, § 16, an accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, and to present a defense. Outside the presence of the jury, defense counsel called Shannon Smith, Teris Ashborne, Mitchell Dye and Shirl Fabella and questioned these witnesses concerning their inclination to assert their Fifth Amendment privilege against self-incrimination.
When Teris Ashburn and Mitchell Dye were called by defense counsel outside of the presence of the jury, both testified charges were pending against them; they had been advised by their respective attorneys to take the Fifth Amendment; and they intended to assert their privilege against self-incrimination. The defense counsel released these witnesses from his subpoena without formulating individual questions to the witnesses to isolate the facts they might have testified to.
Shannon Smith stated he had pled guilty to charges stemming from this same undercover operation pursuant to a plea bargain. He had not been sentenced. The court requested Smith's attorney, Jim Miller, to explain what his objections were to Smith's testifying. Miller stated due to the *1269 pending pre-sentence investigation, the ambiguity of dates in the minds of witnesses and the possibility Smith might testify to a crime not covered by his plea bargain, he could not recommend Smith testify without a guarantee of immunity from the State.
The trial court stated if Shannon Smith asserted his Fifth Amendment privilege, then the only specific questions about his criminal activity which could be delved into would be the matters to which he had pled guilty. The trial court also maintained if Smith did not wish to assert his Fifth Amendment privilege, then he could testify to anything he wished to.
Defense counsel did not call Shannon Smith to the stand nor did he require this witness to assert his Fifth Amendment privilege on a question-by-question basis. He did not inform the court he objected to the asserting of the witnesses rights; and he did not attempt to traverse the witness' right to assert his privilege. Having thus failed, defendant cannot contend the trial court erred by allowing this witness to utilize his Fifth Amendment privilege. See by analogy State v. Daniels, 346 So.2d 672 (La.1977).
Shirl Fabela was also arrested as a result of the undercover investigation by Ray Smith. She was called outside the presence of the jury and stated she had already pled guilty to charges against her and had no further charges outstanding. Her attorney advised her to take the Fifth Amendment, and she stated she intended to do so if called before the jury. Defense counsel indicated he still intended to put her on the stand. Fabela understood she had no Fifth Amendment privilege regarding charges which had already resulted in a plea of guilty. However, defense counsel did not call Fabela as a witness for the defense.
Both Smith and Fabela had been advised by the court they could not assert Fifth Amendment privileges as to certain matters. Since defense counsel did not call these witnesses before the jury, any implicit ruling by the trial court did not prejudice the substantial rights of the accused. La. C.Cr.P. Art. 921. Defendant did not explain how Smith's or Fabela's testimonies would have aided his defense and he failed to prove he was prejudiced by their asserted intentions to invoke Fifth Amendment rights. See State v. Coleman, 406 So.2d 563 (La.1981).
The trial court explained to both of these witnesses they did not have a Fifth Amendment privilege where the facts were related to the crimes on which they had been convicted. However, the trial court stated any other information that might reveal a new crime or a crime for which they had not been convicted would carry a privilege against self-incrimination. Whether or not the witness chose to invoke this privilege was a decision each would need to make. The only point at which any of these "witnesses" would have asserted their Fifth Amendment privilege would have been during the prosecutor's cross-examination. The trial court did not err in giving these instructions nor did he grant any "blanket" Fifth Amendment privilege.
Defense counsel released two of the witnesses listed, two testified without asserting their privilege, and counsel did not attempt to require the remaining two witnesses to testify before the jury at all. Shannon Smith and Shirl Fabella did not assert their Fifth Amendment privilege on a question-by-question basis as counsel could have required while presenting a defense on behalf of his client. See State v. Coleman, supra. Defense counsel did not attempt to traverse the witnesses' allegations their testimony would incriminate them. There was no erroneous ruling. La. C.Cr.P. Art. 841; State v. Daniels, supra.
Assignment of Error No. 2
Defendant next asserted the trial court committed reversible error when it failed to grant defendant's motion to quash on the grounds of prosecutorial misconduct by the State's agent and chief witness, Cleveland Ray Smith.
Pursuant to La.C.Cr.P. Art. 531, all pleas or defenses raised before trial shall be urged by a motion to quash. The issue of governmental misconduct was raised in a pre-trial motion styled "Motion to Dismiss Indictment or Bill of Informations." The *1270 trial court correctly denied the defendant's motion to quash. See State v. Marks, 503 So.2d 32 (La.App. 1st Cir.1986), writ denied, 506 So.2d 110 (La.1987).
In Maumus v. Department of Police, New Orleans, 457 So.2d 37 (La.App. 4th Cir.1984), writ denied, 461 So.2d 1054 (La. 1985), the Fourth Circuit set forth the law pertaining to governmental misconduct:
"In certain prescribed instances the Government is estopped from bringing a prosecution because of [its] own misconduct. The involvement of the government agents in a crime will bar prosecution if the methods used violate fundamental fairness and due process so as to be characterized as too over reaching ...
There is a distinction between `governmental misconduct' and `entrapment' and although the two concepts are similar there exists a major distinguishing characteristic. The defense of entrapment, like the defense of governmental misconduct, is a court created limitation on government activities. Both defenses arise from a strong policy consideration which necessitates fairness.
Rather the thrust of the defense of governmental misconduct is upon the activities of the government agents. The defendant will prevail on the issue of governmental misconduct if it is shown that the conduct of the governmental agents is so intrusive and over-reaching as to be violative of the principles of fairness and due process." 457 So.2d at 48-49 (citations omitted).
A defendant cannot avail himself of the governmental misconduct defense when he has been an active participant in the criminal activity which gives rise to his arrest. A due process violation founded upon the defense of governmental misconduct will be found only in the rarest and most extreme circumstances. State v. Marks, supra, citing United States v. Yater, 756 F.2d 1058, 1066 (5th Cir.), cert. denied, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985).
In Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Supreme Court recognized that in a given case, the government's conduct may be so outrageous as to violate due process. However, concurring justices in the Hampton plurality emphasized that, "... police over-involvement in crime would have to reach a demonstrable level of outrageousness before it could bar convictions." Hampton, at 495, Note 7, 96 S.Ct. at 1653, Note 7 (Powell, J., concurring).
In United States v. Twigg, 588 F.2d 373 (3rd Cir.1978), convictions were reversed because the governmental involvement in the criminal activities of the case had reached "a demonstrable level of outrageousness". The court, after noting the government agent suggested the establishment of the drug laboratory, provided the location, the equipment, supplies and know-how, and then ran the entire operation with only meager assistance from the defendants, found a demonstrable level of outrageousness.
In Maumus, supra, the court found the tactics of inducement, in connection with an investigation into alleged wrongdoing of a police officer, were so pervasive as to constitute governmental misconduct. Maumus involved a municipal disciplinary action; however, it was clear the court was also addressing itself to governmental misconduct in criminal prosecutions. The investigators had provided the officer with a hotel room, champagne glasses, and a female tenant, clad in a skimpy, translucent negligee. The female tenant of the hotel room was very drunk, having consumed, prior to the officer's arrival, a bottle of champagne. Maumus, after initially responding to his police beeper, returned to the room and disrobed, leaving his service revolver, beeper, and identification wallet somewhere across the room from the bed. Officers burst into the room, finding Maumus lying naked in bed with the female tenant of the hotel room. It was undisputed Maumus was on duty at this time. Based on all of the facts and circumstances of that case, the court found that it would be a denial of due process to allow an individual to be disciplined as a result of such governmentally created violation of employment regulations. Defense counsel *1271 in his motion to quash stated that some of the matters which would be presented at the hearing on the motion to quash were: Ray Smith repeatedly contacted Boyd in front of witnesses in an attempt to obtain marijuana only to be refused; he used marijuana in the presence of Boyd and delivered marijuana to Boyd's residence; he sold marijuana to other persons in Boyd's presence; he sold marijuana and other controlled dangerous substances to numerous other persons to the knowledge of Boyd; he introduced certain young citizens to drug use; and he was the prime moving force behind most of the drug transactions occurring in "busts" in West Carroll Parish.
Defense counsel asserted this factual listing was only illustrative and would be supplemented at the hearing on the motion to quash. However, these assertions were not confirmed at the hearing on the motion to quash or at trial.
At the hearing, Cleveland Ray Smith related the circumstances of defendant's first sale of marijuana to him. He denied ever "shotgunning" marijuana, smoking a pipe containing marijuana, sticking a needle in his arm, or selling drugs to anyone in West Carroll Parish. Smith testified that he simulated smoking marijuana, but never simulated "snorting" crystal. He denied he had ever simulated smoking marijuana in front of his children. Smith also denied giving marijuana to a 13-year old juvenile or teaching the juvenile how to smoke marijuana. He testified he had not been to defendant's house four or five times attempting to sell drugs to defendant. Defense counsel, during Smith's testimony, looked to see if Smith had any needle marks. He did not.
Joey Desselle testified at the hearing on the motion to quash that he had an agreement to plead guilty to possession of marijuana. He was arrested as a result of Smith's investigation. Desselle stated he had seen Smith smoke marijuana and take pills, he had seen marijuana smoked at Smith's house almost every day, and on some occasions marijuana had been smoked with Smith's children present. Desselle testified he saw Smith "shotgunning" marijuana.
While he did not know if any marijuana sold on September 12, 1987, was defendant's, he stated he did not hear Smith ask defendant to come over to his house on September 12, 1987. Desselle claimed Smith sold marijuana to John Riddell and Smith was under the influence of marijuana on each occasion that Desselle saw Smith. Desselle was one of the persons arrested as a result of the undercover operations of Smith.
At this hearing on the motion to quash, Sheila Riddell testified her husband was in jail for five counts of distribution of marijuana (the result of the undercover operation) and one count of simple burglary. She stated Smith came to their home looking for marijuana on one occasion. When Smith came to their house, he brought marijuana and other drugs with him, occasionally giving her husband marijuana. She also testified she saw Smith smoke marijuana with her husband and others, she saw Smith snort a white powder, and she saw Smith sell marijuana to others. She claimed Smith smoked marijuana in front of his children, and on one occasion blew marijuana smoke in his baby's face. However, she admitted she was never at Smith's house when defendant was present and she did not know anything about the case at bar.
Sandra Smith testified at the hearing on the motion to quash. She was married to Shannon Smith who was charged with seven counts of distribution of a controlled dangerous substance as a result of the undercover operations of Cleveland Ray Smith. Ms. Smith testified Ray Smith had smoked marijuana in her presence and had sold marijuana to her husband. She stated she saw Ray Smith use cocaine and blow smoke in his baby's face. However, Sandra Smith did not know of any contact by this defendant with Smith.
Kevin Waits, a participant on September 12, 1987, testified at the hearing on the motion to quash that he believed Boyd had the marijuana on the date that it was sold at Smith's house. He and Boyd were *1272 friends. Waits stated Boyd had asked him why he was testifying at his trial. Regarding the events of September 12, 1987, Waits testified Boyd got the "dope" out of his wife's purse and received money from Cleveland Ray Smith for the marijuana. Waits stated he did not see Smith smoke marijuana.
When governmental misconduct has been successfully asserted, the governmental misconduct has been directed at the defendant. In the case at bar, there was no such showing at the hearing on the motion to quash. As the trial court correctly pointed out, no disinterested testimony was elicited which supported the allegations in the motion to quash alleging governmental misconduct. The trial court noted it was not his function to determine the credibility of witnesses at the hearing on the motion to quash. Thus, the trial court correctly denied the motion. The conduct of the governmental agent in question was not proven to be so intrusive and overreaching as to be violative of the principles of fairness and due process.
The jury, as factfinder, heard the testimony of all the defense witnesses claiming the agent was guilty of misconduct, and then found the defendant guilty as charged. There is ample evidence defendant was clearly an active participant in the offenses with which he was charged and convicted. See State v. Marks, supra. The defense of governmental misconduct sufficient to defeat the conviction of this defendant was correctly rejected.
Assignment of Error No. 3
Defendant alleges the trial court committed reversible error when it failed to grant defendant's motion for a mistrial based on the introduction of evidence of other crimes.
Sheriff Gary Bennett testified several people suspected Cleveland Ray Smith of being a drug agent and were requiring Smith to engage in illegal acts to prove he was not an agent. At this point, the undercover operation ceased.
During the direct examination of Cleveland Ray Smith (the undercover officer), the prosecutor asked Smith how his drug investigation in West Carroll Parish ended. Smith testified: "I had one boy in town that kept trying to fight me. And then I had David and a few other ones trying to... they tried to work it out where they wanted me to sell them drugs." Defense counsel objected and moved for a mistrial, claiming this statement by Smith was an impermissible reference to evidence of other crimes.
After the jury returned, Smith continued to testify about why his undercover activities ceased. He stated:
".... And then I had David Boyd, he tried to ... he wanted me to... he told me to go get.... he said, `Go get me a ten dollar ($10.00) bag of marijuana.' And he would give me.... he said he would give me...."
Defense counsel objected arguing, at a minimum, evidence of a conspiracy had been presented. After the jury returned, Smith again was asked why his undercover operations ceased. He stated:
"Alright. I had this boy named Pat that kept trying to fight me. And he would.... and he was going around telling everybody that I was a nark (sic). And then I had a boy.... David Boyd who brought a few friends by my house one night. And they wanted me to go and buy some marijuana and sell it to prove to them that I wasn't a nark (sic)."
Defendant asserts in his brief the undercover officer, Smith, impermissibly referred to evidence of other crimes and claims this as a basis for a mistrial. La.C. Cr.P. Art. 770(2).
The law regarding mistrial based on testimony by "police officers" was explained in State v. McGuffey, 486 So.2d 1101, 1107 (La.App. 2d Cir.1986). The court stated:
"A trial judge should grant a mistrial only where the prejudicial remarks result in substantial prejudice to the defendant and make it impossible for him to obtain a fair trial. State v. Burdgess, 434 So.2d 1062 (La.1983); State v. Johnson, 440 So.2d 838 (La.App.2d Cir.1983). The trial judge, instead of granting a mistrial, may admonish the jury when he believes *1273 that an admonition is sufficient to assure defendant a fair trial. State v. Michel, 422 So.2d 1115 (La.1982). Moreover, a mistrial is a drastic remedy which is only authorized where such substantial prejudice would otherwise result to the accused. State v. Smith [418 So.2d 515 (La.1982) ], supra; State v. Johnson, supra.
... In the absence of clear prejudice, a witness' unsolicited reference to other crimes by the accused warrants only an admonition that the jury disregard the objection or remark. However, a prejudicial remark by an experienced police officer should be viewed with considerable concern as to the fairness of the trial and it may require granting a mistrial, especially if the remark was precipitated by or should have been anticipated by the district attorney. Nevertheless, the decision as to the necessity of granting a mistrial or the circumstances is left to the sound discretion of the trial court. State v. Goods [403 So.2d 1205 (La. 1981) ], supra; State v. Odds, 430 So.2d 1269 (La.App. 1st Cir.1983). Although the Supreme Court has held that a police officer's unsolicited, unresponsive reference to another crime alleged to have been committed by a defendant is not the comment of a court official under La.C. Cr.P. Art. 770(2), such an officer will be held to the same standard if his answers show a pattern of unresponsiveness or improper intent. State v. Nuccio, 454 So.2d 93 (La.1984); State v. Harris, 383 So.2d 1 (La.1980); State v. Schwartz, 354 So.2d 1332 (La.1978)."
The trial judge correctly denied all motions for mistrial based on the testimony. He stated "going to someone and asking them to procure a bag of marijuana is not a crime." However, the trial court conceded that the prosecutor "was walking a very thin line."
The question on appeal was whether there was a reference to evidence of other crimes. There could exist no criminal conspiracy between defendant and the unwilling undercover agent, Smith. See State v. Joles, 485 So.2d 212 (La.App. 2d Cir.1986); State v. Kihnel, 488 So.2d 1238 (La.App. 4th Cir.1986), writ denied, 494 So.2d 1174 (La.1986).
A conspiracy between defendant and some unnamed friends to incite Smith to distribute controlled dangerous substances might have been inferred. The act in furtherance of that conspiracy would be the asking of Smith to do the act. However, it is difficult to believe that a conspiracy to incite a felony would constitute an offense so prejudicial as to require a mistrial. See State v. Kihnel, supra, and the Reporter's comments to La.R.S. 14:28.
It is arguable this testimony constituted "other crimes" evidence of a conspiracy to possess marijuana or to distribute marijuana (as a principal). However, the solicitor (Smith) agreed to procure marijuana which would appear to constitute the crime of conspiracy, pursuant to the Reporter's comments, but, as stated above, there could be no conspiracy with the undercover agent. In any event, any alleged "other crimes" evidence was tenuous at best.
In State v. Wingo, 457 So.2d 1159 (La. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985), rehearing denied, the arresting officer testified the defendant told the arresting officer he always used a certain pair of gloves when he committed a crime. The court found no abuse of discretion by the trial court in denying the motion for mistrial, since the response merely referred to an unspecified crime which had been committed by defendant.
In State v. Maiden, 463 So.2d 848 (La. App. 2d Cir.1985), the court found that an admonition was sufficient to prevent any prejudice to the defendant's right to a fair trial in a case in which an officer had alluded to the fact that defendant had "broken into so many different places and he told us he had taken so much stuff."
In State v. Watson, 449 So.2d 1321 (La. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985), the trial court found that an admonition was sufficient to assure the defendant a fair trial when an officer stated that defendant's common-law wife refused to answer questions because "she feared her life from Mr. Watson."
*1274 Smith was an experienced undercover officer; his remarks should have been viewed with considerable concern as to the fairness of the trial, especially since the prosecutor precipitated the statement by asking what caused the undercover operation to cease with knowledge of the response that would be forthcoming. However, even assuming Smith referred to other crimes committed by defendant, the trial court did not abuse its discretion in denying a mistrial.
Defendant was not surprised by this testimony. Defendant did not request that a limiting instruction be given in order to prevent undue prejudice to defendant.
Furthermore, the information testified to was relevant to counter any anticipated argument the undercover operation may have ceased because of allegations of improper conduct by Officer Smith or to rebut an entrapment defense. An exception to La.C.Cr.P. Art. 770 is made if the evidence is substantially relevant to show some purpose other than the accused is a bad person and, therefore, more likely to have committed the crime. See State v. McGuffey, supra.
In the case at bar, the prejudicial effect of this testimony by Smith, if any, was outweighed by its relevancy. Defense counsel repeatedly tried to prove governmental misconduct on the part of Smith. This information was relevant to dispel any thoughts in the mind of the jury that the undercover operation was ceased due to complaints or allegations of Smith's misconduct. This information also had relevance regarding guilty knowledge.
The drastic remedy of mistrial was not warranted; no substantial prejudice resulted to the defendant. The trial court did not abuse its discretion in denying a mistrial. Other than attacking the credibility of Smith, the charges of distribution of marijuana were basically unrefuted. In fact, in defense's closing argument, the focus is upon the alleged misconduct of Officer Smith. This assignment of error is meritless.
For these reasons, the defendant's conviction and sentence are AFFIRMED.

ON APPLICATION FOR REHEARING
Before MARVIN, FRED W. JONES, Jr., HIGHTOWER, HALL and SEXTON, JJ.
Rehearing denied.